# EXHIBIT 1

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV  25305



9171 9237 9000 1000 5204 11



**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

| | |
|---|---|
| ControlNumber: | 321271 |
| Defendant: | DISCOVER FINANCIAL SERVICES, INC. |
| County: | 26 |
| | 9/1/2011 |
| Civil Action: | 11-C-86-N |

DISCOVER FINANCIAL SERVICES, INC.
CT CORPORATION SYSTEM
208 SO. LASALLE STREET, SUITE 814
CHICAGO IL  60604

I am enclosing:

| | | |
|---|---|---|
| _____ summons | _____ affidavit | __1__ summons and complaint |
| _____ notice | _____ answer | _____ summons and verified complaint |
| _____ order | _____ cross-claim | _____ summons and amended complaint |
| _____ petition | _____ counterclaim | _____ 3rd party summons and complaint |
| _____ motion | _____ request | _____ notice of materialmans lien |
| _____ suggestions | _____ notice to redeem | _____ notice of mechanic's lien |
| _____ interrogatories | _____ request for production | _____ notice of uim claim |
| _____ discovery | _____ request for admissions | _____ subpoena duces tecum |
| _____ suggestee execution | _____ re-issue of uim claim | _____ Other |
| _____ subpoena | _____ writ | |
| _____ stipulation | _____ writ of mandamus | |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have
accepted service of process in the name and on behalf of your unauthorized foreign corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of
process in your name and on behalf as your attorney-in-fact.   Please address any questions about this document directly
to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office.***

*Sincerely,*

Natalie E. Tennant
Secretary of State

# SUMMONS

## IN THE CIRCUIT COURT OF MASON COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel.
DARRELL V. McGRAW, JR.,
ATTORNEY GENERAL,

       Plaintiff,

v.                                                          Civil Action No. 11-C-86-N

DISCOVER FINANCIAL SERVICES, INC.
DISCOVER BANK, DFS SERVICES, L.L.C. and
ASSURANT, INC.

       Defendants.

To the above named defendant:    Discover Financial Services, Inc.
                             c/o CT Corporation System
                             208 So. LaSalle Street, Suite 814
                             Chicago, IL 60604

       IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned

and required to serve upon Bucci, Bailey & Javins, L.C., plaintiff's attorney, whose address is Post

Office Box 3712, Charleston, West Virginia, 25337, an Answer, including any related counterclaim

you may have, to the Complaint filed against you in the above-styled civil action, a true copy of

which is herewith delivered to you.  You are required to serve your answer within **30** days after

service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by

default will be taken against you for the relief demanded in the complaint and you will be thereafter

barred from asserting in another action any claim you may have which must be asserted by

counterclaim in the above-styled civil action.

Dated: *August 16, 2011*                    *Bill Withers plh*
                                       Clerk of the Court

ACCEPTED FOR SERVICE OF PROCESS
2011 SEP -1  PM 3:45
SECRETARY OF STATE
STATE OF WEST VIRGINIA

IN THE CIRCUIT COURT OF MASON COUNTY, WEST VIRGINIA

STATE OF WEST VIRGINIA ex rel.
DARRELL V. McGRAW, JR.,
ATTORNEY GENERAL,

Plaintiff,

v.

Civil Action No. <u>11-C-86-N</u>

DISCOVER FINANCIAL SERVICES, INC.
DISCOVER BANK,
DFS SERVICES, L.L.C. and
ASSURANT, INC.

Defendants.

## COMPLAINT

Plaintiff, the State of West Virginia, by Darrell V. McGraw, Jr., Attorney General ("the

State") brings this Complaint against the Defendants Discover Financial Services, Inc., Discover

Bank, DFS Services, L.L.C. and Assurant, Inc. (collectively "Defendants" or "Discover") and

alleges as follows:

## INTRODUCTION

1.      This action stems from how the Defendants market, sell, and administer to West

Virginia consumers fee-based services, which are ancillary to their credit cards.

2.      Defendants market such ancillary services as protection to consumers against

fraudulent or unauthorized charges on their credit cards, identity theft, and lost or stolen credit

cards and/or as providing benefits in the event of unemployment or disability.  Each ancillary

service is marketed only to the Defendants' current card holders, and the services themselves are

attached to the cardholders' specific account at issue.

3.      Upon information and belief, when consumers apply for and receive Defendants'

credit cards, a process is triggered whereby a consumer can unknowingly and unintentionally

sign up to receive ancillary services.

-1-

4.    Additionally Defendants often enroll consumers for such services without the consumers' consent. This process is referred to as "slamming." Enrollment may be based on highly deceptive and misleading telemarketing calls, forged or non-existent mailers or online applications, or nothing at all. Defendants are in a position to charge consumers with monthly fees without their consent because, unlike a typical marketer or seller, they are already the consumer's credit card company and already have their credit card number.

5.    Further, for certain types of ancillary services, including but not limited to Discover Payment Protection and other monikers that all offer similar coverage (hereinafter collectively referred to as "Payment Protection Plans" or "Plans"), that purport to pay the consumer's required minimum monthly payment due for a limited period of time under certain triggering situations, such as involuntary unemployment, illness, or changes in family status, thus preventing the account from becoming delinquent, Defendants make no effort to determine whether consumers are even eligible for the Payment Protection Plans' benefits at the time of sale. As a consequence, Defendants bill ineligible West Virginians for this coverage, even though their status at the time of enrollment prevents them from receiving benefits under the terms of these Payment Protection Plans.

6.    The Defendants commit deceptive business practices and violate statutory and common law by charging consumers for ancillary services, including Payment Protection Plans, who either did not want them or were not entitled to benefits thereof, and by the unfair and deceptive manner in which Defendants offer and administer claims for benefits by consumers.

7.    As a result of such unfair and deceptive practices, Defendants have amassed millions of dollars with virtually no benefits to West Virginia citizens who are nevertheless charged for these services month in and month out.

8.    The State of West Virginia, by and through Attorney General Darrell V. McGraw, as an administrator of the law, brings this action in its sovereign and quasi-sovereign capacity on behalf of the State to protect citizen consumers of West Virginia.

### PARTIES

9.    This action is brought by the State of West Virginia.  Darrell V. McGraw, Jr., the Attorney General of the State of West Virginia, is authorized under W.Va. Code §§ 46A-7-108 through 46A-7-111 and under common law authority, to bring this action on behalf of the State and its citizens to enforce West Virginia law.

10.    Defendant Discover Financial Services, Inc. (DFS Inc.) is incorporated in Delaware and its principal place of business is at 2500 Lake Cook Rd., Riverwoods, Illinois 60015.  DFS Inc. is organized as a bank holding company and financial holding company DFS Inc. wholly-owns Discover Bank and DFS Services, L.L.C.  DFS Inc.'s 2009 Annual Report indicates that it is involved in the marketing and sale of ancillary services discussed in this Complaint.

11.    Defendant Discover Bank is a Delaware state-chartered bank and a leading credit card issuer. Discover Bank's principal place of business is at 502 E. Market St., Greenwood, DE 19950.  Discover Bank is a wholly owned subsidiary of Defendant DFS Inc.

12.    Defendant DFS Services, L.L.C. (DFS LLC), formerly known as Discover Financial Services, L.L.C., is a limited liability company duly organized and existing under the laws of the State of Delaware, having a principal place of business in the State of Illinois.  The sole member of the limited liability company DFS LLC is DFS Inc.  Upon information and belief, DFS LLC is Discover Bank's service affiliate and, as such, provides various services for Discover Bank such as marketing, application approval, transaction approval, customer service,

security, billing and the collection of delinquent accounts. DFS LLC's principal place of business is located at 2500 Lake Cook Road in Riverwoods, Illinois 60015.

13.     DFS Inc., Discover Bank and DFS L.L.C. are referred to jointly as "Discover." Discover is one of the largest credit card issuers in the United States. Discover's 2009 Annual Report boasts that 1 in every 4 American households has a Discover credit card. There are reportedly 54.4 million Discover credit cards in circulation in the United States, including within the State of West Virginia.

14.     Defendant Assurant, Inc. (Assurant) is incorporated and organized in the State of Delaware, having a principal place of business in the State of New York. Upon information and belief, Assurant assisted Discover with its ancillary services, including Payment Protection, by managing and administering enrollment, activation of benefits, communications with customers (including sending Welcome Kits and claim responses) and plan cancellations, as well as providing administrative and sales support.

## JURISDICTION

15.     This Court has subject matter jurisdiction over the claims made by the State herein pursuant to Article VIII, Section 6 of the West Virginia Constitution, W.Va. Code § 51-2-2, and W. Va. Code § 53-2-2. The Attorney General has the power to bring these claims on behalf of the State under the provisions of W. Va. Code §§ 46A-7-101, et. seq.

16.     This Court has personal jurisdiction over the Defendants because they do business in West Virginia and have committed acts in West Virginia causing injury to West Virginia consumers.

17.     This Court's subject matter jurisdiction is exclusive. The State brings this action in its governmental and quasi-governmental capacity and cannot be considered a citizen of any state for diversity purposes. The State asserts no claims arising out of, under or in any way

preempted by the laws (common, statutory and administrative) of the United States, nor does it purport to maintain this action as a representative member of a class. The State specifically disclaims any such claims that would support removal of this action to a United States District Court on the basis of diversity, CAFA jurisdictional mandates, federal question jurisdiction, or any other basis.

## VENUE

18.     Venue and personal jurisdiction in Mason County is proper because Defendants all conduct business in this County and accordingly, the cause of action arose, in part, in this County.

19.     Venue is also proper pursuant to W. Va. Code §§ 46A-7-114 and 561-1(a)(2) because the violations of law alleged in this Complaint occurred throughout the State of West Virginia, including within Mason County.

## FACTUAL BACKGROUND

**I.    Defendants Market and Sell Ancillary Services to Cardholding Consumers Which Generate Substantial Revenue for them.**

20.     Defendants market and sell ancillary services to all of their credit card customers, but most aggressively market these services to vulnerable West Virginia consumers who fall into the subprime credit category, who have low credit limits because of impaired credit ratings, or who are looking to establish or re-establish their credit.

21.     Defendants' ancillary services share common characteristics in that each are: (a) marketed as ways for consumers to protect themselves from fraud, unauthorized charges or to increase their financial security, and (b) the purchase of an ancillary services is not a requirement for receiving a credit card. Such ancillary services are tethered to consumers' specific credit card accounts, and billed directly to the account monthly, with no separate bill provided.

22.    Examples of Defendants' ancillary services include:

(a).    **Payment Protection** – this service that allegedly safeguards subscribers' credit card accounts by canceling or temporarily suspending the required minimum monthly credit card payments due in certain highly restricted circumstances, or permanently canceling accounts in other circumstances.

(b).    **Identity Theft Protection** – In exchange for a fixed-rate monthly fee, this service purports to monitor consumers' credit score for indicia of identity theft and will alert the enrollee if something suspicious happens to their credit score.

(c).    **Wallet Protection** – In exchange for a fixed-rate monthly fee, if the consumers' wallet is lost or stolen, Defendants will contact the issuers of the consumers' credit cards to cancel the cards lost or stolen.

(d).    **Credit Score Tracker** – In exchange for a fixed-rate monthly fee, this service provides consumers with copies of their credit report(s) and tools that allow them to track their credit score on a daily basis. However, the three major credit reporting agencies are required by federal law to provide consumers with one free credit report each year.

(e).    **Extended Warranty** – also known as "SquareTrade Care Plan," this service provides extended warranty coverage for items broken after purchased, regardless of whether purchased with the Discover card.

23.    Defendants' ancillary services are in fact a dense maze of limitations, exclusions and restrictions, making it impossible for consumers to knowingly determine what these services cover and whether they provide a financial benefit.

24.    Defendants have enrolled West Virginians and charged them for enrollment in these services.

25.    Defendants have devised a scheme to increase the profits they receive from their ancillary services exponentially. By limiting the amount of credit given to West Virginia consumers, but issuing multiple cards to them, Defendants are able to impose separate monthly fees for these services on each of the consumers' cards. This scheme doubles, triples or more, the monthly fees charged without any analogous increased risk to Defendants.

II.   **Defendants Sign up Unsuspecting Cardholding Consumers for Ancillary Services Without Their Meaningful, Knowing Authorization or Consent.**

26.    Defendants often enroll consumers for these services based on highly deceptive and misleading telemarketing calls, charging some consumers without their meaningful consent or understanding that their credit card will be charged for these services. Defendants are in a unique position to do this because, unlike a typical seller or marketer, they are the consumers' credit card company and already have their credit card numbers. The State of West Virginia brings this consumer protection lawsuit against Defendants to address their unfair and deceptive business practices.

A.    **The Way Ancillary Services are Marketed is Unfair and Deceptive.**

27.    Defendants sell ancillary services to consumers through a number of different channels, including online and direct mail marketing, in which they may ask that consumers "check the box" to initiate the plan, and through telemarketing, where consumers may be asked to press a button on the telephone or verbally agree in order to approve initiation of the plan. The former channels require an affirmative action by the consumer to enroll, such as checking a box or initializing a monthly statement or other mailer or online form in a designated space to authorize enrollment. For a consumer that "checked the box" or initialized a document, confirming consumers' assent to be billed for ancillary services is easily traceable. On the other hand, for those whose assent was allegedly obtained through telemarketing (upon information and belief, the majority of ancillary service customers), confirmation of affirmative assent requires a review of the call itself.

28.    In addition to Defendants' financial motive to enroll as many West Virginians as possible into these highly lucrative ancillary service schemes, individual telemarketers are incentivized to enroll as many cardholders as possible, either because their compensation is

commission-based or because their performance is otherwise evaluated and subsequently compensated on the number of cardholders they enroll.

29.   Deceptive practices are rife in telemarketing these services.

30.   Defendants' telemarketers employ an array of deceptive sales tactics to elicit cardholders into communicating some affirmative response, knowing that the cardholders do not actually understand that they are supposedly agreeing to purchase an ancillary service.

31.   Defendants' telemarketers characterize the call as a courtesy to thank cardholders and remind them of benefits they already get through their credit card agreement (like cash back, airline miles, rewards, etc.), when in fact they are calling to sell ancillary services.

32.   Telemarketers may speed through, skip altogether, butcher or alter the text of the information they are required to provide to cardholders (the "disclosure"), in an effort to make the disclosure sound like incomprehensible legalese, then say "OK?" or ask if the person heard them or understood, knowing that such a question will almost always elicit an affirmative response such as "ok" or "yes." The cardholders believe they have just listened to a courtesy call, but the Defendants treat the innocuous affirmative response as the cardholders' agreement to enroll in the plan. These cardholders may say "ok" or "yes" at the conclusion of the call, but no reasonable person listening to the recordings of these calls would conclude the cardholders were giving their knowing, meaningful assent to be charged a monthly fee for enrollment in the plan.

33.   Another tactic Defendants' telemarketers use is to ask cardholders if they may simply send out a "packet of information" about the plan. Defendants treat an affirmative response to this inquiry as authorization for paid enrollment, even though consumers do not believe they have agreed to purchase anything.

34.     Each Defendant has such a "packet of information" for each of the Plans offered and Defendants are required to provide enrollees with this information. For example, Defendants use a document entitled "Discover Payment Protection Benefit Guide" for this purpose for its Payment Protection Plans. Many West Virginians never received the packets allegedly sent out. Others who received the packet ignored or disregarded it because they did not understand that they had already been enrolled. They may have assumed the packets were just another piece of junk mail from a credit card company. While those cardholders that told the telemarketer they could send information about the plan may have recognized what the packet relates to, they assumed further steps must be taken by them before they are enrolled in the plan. If the slammed consumer simply throws out the packet, without reading it, signing it or conferring with the credit card company about it, they are nevertheless still enrolled in the plan.

35.     Defendants utilize the card activation process as another way to wrongfully enroll consumers. Consumers are told they must call Defendants from their home phone number to activate their card. Defendants take this opportunity to sell ancillary services. Cardholders who are calling to activate a credit card are particularly susceptible to believing that the "disclosure" is some legal text that must be read to the cardholder, rather than an alleged contractual agreement to purchase an optional ancillary service of little or no value to them. Many West Virginia cardholders do not comprehend the terms and conditions communicated to them. They reflexively reply "ok," and have no idea that they have supposedly purchased some optional ancillary service.

36.     In addition to deceptively inducing cardholders to say "yes" or "ok" during the call, Defendants enroll some cardholders who did not provide any affirmative response. In such instances, Defendants have no proof of affirmative assent, either because there is no affirmative

response on the recording, there is a clear rejection of the offer, or a record of the call does not exist. Yet the cardholder is still enrolled in the plan.

37.    And unlike in traditional telemarketing calls, the telemarketer does not need the consumers to provide their credit card numbers and information to purchase the service because the telemarketer is the credit card company. As a result, Defendants can simply charge consumers' accounts even when there has been no clear and knowing consent given.

**B.    West Virginia Consumers "Slammed" with Ancillary Services Receive Little to No Relief from the Defendants.**

38.    Defendants know that slamming occurs frequently. In fact, the "refund" process itself is set up on the assumption that consumers have been deceived and do not understand that they have been enrolled. When consumers call to cancel within 30 days of being enrolled, they are supposed to get their money back no questions asked, and Defendants make no effort to then determine how the cardholders were enrolled without their authorization.

39.    However, many Cardholders continue to have no idea they are enrolled in an ancillary service plan and do not notice or appreciate the meaning of the line-item charge for the plan on their credit card bills. The charge appears among the other purchases on the cardholder's monthly statement.

40.    Some cardholders do not receive or review monthly bills because they have an online account and do not approve charges to particular accounts they are simply seeking to pay off, took advantage of a balance transfer offer or utilized to make a single purchase. Consumers may pay this hidden charge month after month for many months before they become aware of it.

41.    In addition to the obvious unfairness of enrolling cardholders without their valid authorization, Defendants reap an extra windfall because these enrollees will never invoke the supposed benefits of the plans for which they were charged because they do not even know they may do so.

-10-

42.     If cardholders do not discover the deceit until more than 30 days after being enrolled, Defendants will not automatically refund the cardholder.

43.     Cancellation of plans and disputes about enrollment are so widespread in this industry that Defendants use template form letters to send to slammed consumers who complain. Instead of "coming clean" to these aggrieved consumers, Defendants make it exceedingly difficult for them to get relief, such that many West Virginia consumers give up hope of ever getting their money back after paying for a service they did not request and did not use.

**III.     Defendants Sell Payment Protection, a Specific Ancillary Service, to West Virginia Consumers who can Receive Little to No Benefit from the Coverage Offered.**

44.     Defendants represent their Payment Protection Plans as services that defer the required minimum monthly payment due on the subscriber's credit card account, preventing the account from becoming delinquent.

45.     Discover represents that Payment Protection "will help safeguard your account payment history by putting your account on hold during the benefit period . . . if you experience a covered hardship such as disability, hospitalization or one of the other covered events."[1]

46.     As explained in Discover's 2009 Annual Report, Payment Protection is purported to "allow customers to suspend their payments for up to one or two years, depending on the product, in the event of certain covered events. Different services cover different events, such as unemployment, disability or other life events. Depending on the service and state laws, outstanding balances up to certain amounts are canceled in the event of death."[2]

47.     The Plan also purports to allow account holders to put their payments on hold when "celebrating one of life's happy events, like moving to a new home."[3]   The Plan is not an

---

[1] http://www.discovercard.com/protection-solutions/payment-protection.html, (last accessed on Jan. 29, 2011)
[2] DFS 2009 Annual Financial Report at 6.
[3] *Id.*

-11-

automatic benefit provided to all account holders. Instead, account holders' purchase of Discover Payment Protection is "optional."

48.    Payment Protection is the most lucrative of Discover's optional fee-based services. Discover earned close to $300 million from its fee services in 2009, up from $215 million just two years earlier.[4]

49.    Defendants market their Payment Protection Plans to individuals who do not qualify for the alleged benefits of the plans. The numerous qualifications and restrictions set forth in Defendants' fine print expose the advertised "safeguard" as a delusion, at best, because the Defendants do not determine consumers' eligibility for various options under the Payment Protection Plan before marketing and selling the Plan to them.

50.    These types of plans offer little to no benefit to consumers for several reasons. Payment Protection Plans are sometimes marketed to elderly consumers, for whom benefits may be of little or no value. The main benefit of such plans is that they suspend payment obligations when the borrower's income stream is lost due to unemployment, disability, or natural disaster. But for those on a fixed income, any such "protection" may be illusory because the "qualifying events" will not disrupt the income stream coming from a fixed income.

51.    Defendants market Payment Protection as a service that will safeguard subscribers' credit card accounts by suspending or crediting the required minimum monthly credit card payments due in certain highly restricted circumstances, or permanently canceling accounts (up to $25,000) in other circumstances. When minimum monthly payments are credited, the monthly interest charges and the Payment Protection Plan fee (and any other ancillary fees) continue to accrue without adequate disclosure to consumers.

---

[4] *Id.* at 70.

52.     The terms offered for the Payment Protection Plans are complicated, vary, and change over time; however, Defendants' Plans provide for some form of payment suspension upon the occurrence of the following events, as it defines the terms: Involuntary Unemployment, Disability, Leave of Absence, Disaster, Hospitalization, and Death of a Child, Spouse or Domestic Partner, the occurrence of some Celebration Events, sometimes including things like marriage, child birth, adoption, college, a home move, a new job and retirement and other closely defined events, and a Death Benefit. The restrictions, limitations and exclusions associated with these events that trigger supposed Payment Protection benefits are expansive and constantly evolving.

53.     Defendants make no reasonable effort and undertake no investigation, including review of information in their possession regarding the cardholder, to determine if Payment Protection coverage would apply to the cardholder. Such information may include health status, name of last employer and date of birth, which would assist Defendants in knowing whether a particular cardholder is eligible for Payment Protection benefits.

54.     Accordingly, Defendants engage in aggressive marketing to enroll West Virginians in Payment Protection even when they have information in their possession indicating that the service may have limited or no value to the particular consumer.

55.     Telephone marketing scripts and written materials provided by Defendants to consumers are incomplete, indecipherable, misleading and obfuscatory.

56.     Written materials include the following restrictions on Payment Protection, but because they are in small print and in incomplete, indecipherable, misleading and obfuscatory language, they are not readily comprehensible to West Virginia consumers:

-13-

(a).    Payment Protection benefits do not apply to retired persons;

(b).    Payment Protection benefits do not apply to persons employed part time or seasonally;

(c).    Payment Protection benefits do not apply to persons employed by family members or not employed;

(d).    Payment Protection benefits are limited to persons self-employed;

(e).    Payment Protection benefits do not apply immediately or for some period directly after unemployment or disability;

(f).    Payment Protection benefits do not apply unless you qualify for state unemployment benefits and continue to meet qualifications;

(g).    Payment Protection benefits do not apply unless you notify the company and provide Verification within a set period of time;

(h).    Subscribers may not be able to use their credit card for new purchases while Payment Protection benefits are being provided;

(i).    Payment Protection coverage is limited to per calendar year maximums; and

(j).    Payment Protection benefits require continued treatment and verification by a physician for the duration of the disability.

57.    For instance, West Virginia retired persons, many of whom are senior citizens, are charged for this service even though they are categorically excluded from receiving many of the benefits under the Plan. Defendants do not ask customers whether they are retired.

58.    Similarly, the benefits offered to self-employed persons are limited, but Discover nevertheless fails to affirmatively inform self-employed persons of the limitations in benefits when they are enrolled. In fact, Discover does not even ask customers whether they are self-employed.

59.    Further, part-time workers, seasonal workers and workers concluding an employment contract (including ending a military tour of duty) are also limited from receiving benefits. To qualify for benefits, one needs to work a set number of hours a week in noncontractual employment considered to be permanent. However, Defendants make no effort

-14-

to investigate whether any of the West Virginia consumers that pay for Payment Protection are part-time, seasonal, contract or military workers. These terms are not adequately communicated or defined in written materials.

60. Finally, benefits are limited for disabled persons, but Defendants nevertheless fail to affirmatively inform these individuals of the limitations in benefits when they are enrolled. In fact, Defendants do not even ask customers whether they are disabled.

61. Defendants employ no process to keep updated on consumers' status, either. Accordingly, when consumers' statuses change, they will continue to pay for Payment Protection even though they may no longer be eligible for benefits.

62. If consumers are eventually provided with written materials, the materials themselves are confusing, and do not require the consumers' signature or affirmative assent before they can be billed for the Plan. It is virtually impossible for the subscriber to determine all of the exclusions and limitations of Payment Protection, or the value of the service, based on what is provided.

63. The cost of Payment Protection is set forth in a confusing and misleading manner. The premium for Payment Protection is set at a dollar amount per $100.00 of the ending statement balance for each particular month. For example, the cost of Payment Protection is $.89 per $100 of the previous billing period's New Balance.[5] Thus, a customer who charges $1000 a month, and even pays off his balance every month, pays $106.80 per year for Payment Protection. Defendants add these amounts directly to the credit card account statement each month.

---

[5] https://www.discovercard.com/customer-service/faq/payment-protection.html, (last accessed on Jan. 29, 2011.

64.     Payment Protection also provides the added benefit to Defendants of lowering available credit to its subscribers through the imposition of this additional fee and getting consumers closer to their maximum credit limit without the consumers' knowledge.  This operates in some instances to cause consumers to exceed their credit limits thereby incurring over-the-limit fees.  Further, the imposition of the fee creates a cycle of profitability, in that the fee itself increases subscribers' monthly credit balances, which in turn increases Payment Protection fees in subsequent months.

65.     Defendants' "customer service" support is set up in such a way that West Virginia consumers cannot easily cancel ancillary services or receive answers to benefit questions, nor can they easily file claims or receive benefits for filed claims. Upon information and belief, Defendants' Payment Protection call center is based overseas.

66.     Upon information and belief, employees at Defendants' Payment Protection call center are given authority to deny claims immediately over the phone, but do not have authority to approve claimants to receive benefits in the same manner.

67.     Moreover, upon information and belief, when subscribers call Defendants attempting to cancel Payment Protection, employees at Defendants' call center are trained to attempt to talk the subscriber out of canceling by "selling" the supposed benefits of Payment Protection.

68.     Further, when claims for Payment Protection benefits are denied, Defendants have not implemented a process through which subscribers' Payment Protection premiums are refunded, even if the subscribers are deemed to be per se ineligible for Payment Protection benefits.  In fact, if West Virginia subscribers are denied Payment Protection benefits, Defendants neither affirmatively remove subscribers from Payment Protection enrollment going

forward, nor do they inform subscribers of their continued obligations to pay for Payment Protection, even though they have been deemed to be ineligible for benefits.

69.     Payment Protection is so confusing as to when coverage is triggered, so restricted in terms of the benefits it provides to subscribers, and processing claims is made so difficult by Defendants, that it is essentially worthless.

70.     Although heralded as coverage designed for a subscriber's peace of mind and for use when times get tough, the Payment Protection device is designed to prey on the financially insecure and is virtually worthless because of the numerous restrictions that are imposed, because of the exclusions of benefits, and because of the administrative and bureaucratic hurdles that are placed in the way of West Virginia consumers who attempt to secure payments from Defendants under Payment Protection coverage.

71.     Payment Protection is a huge profit center for Defendants and serves their interest in generating fee income, to the detriment of their most vulnerable customers.  Defendants know that for those consumers who choose to pay for these services, few will ever receive benefits, and even for those that do, the amounts paid in premiums will usually exceed any benefits paid out.

72.     As a result of their unfair and deceptive marketing practices in connection with sales of Payment Protection, Defendants have increased profits by many millions of dollars, all thanks to services which provide virtually no benefit to the West Virginia residents who are nevertheless charged for these services month in and month out.

## COUNT I
## VIOLATION OF THE WEST VIRGINIA
## CONSUMER CREDIT AND PROTECTION ACT

73.    The State re-alleges all prior paragraphs of this Complaint as if set forth fully

herein.

74.    Article 6 of the West Virginia Consumer Credit and Protection Act, entitled

"General Consumer Protection," is designed to protect persons from unfair or deceptive acts or

practices. W. Va. Code §§ 46A-6-101 to -110, 46A-7-101 et seq. "Unfair methods of

competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are

hereby declared unlawful." Id. at 46A-6-104.

75.    Among other things, § 46A-6-102 defines "Unfair methods of competition and

unfair or deceptive acts or practices" as including, but not limited to, the following:

(E)  Representing that goods or services have sponsorship, approval,
characteristics, ingredients, uses, benefits or quantities that they do not have or that a
person has a sponsorship, approval, status, affiliation or connection that he does not have;

* * * *

(G)  Representing that goods or services are of a particular standard, quality or
grade, or that goods are of a particular style or model if they are of another;

* * * *

(I)  Advertising goods or services with intent not to sell them as advertised;

* * * *

(L)  Engaging in any other conduct which similarly creates a likelihood of
confusion or of misunderstanding;

(M) The act, use or employment by any person of any deception, fraud, false
pretense, false promise or misrepresentation, or the concealment, suppression or omission
of any material fact with intent that others rely upon such concealment, suppression or
omission, in connection with the sale or advertisement of any goods or services, whether
or not any person has in fact been misled, deceived or damaged thereby; [and]

(N)  Advertising, printing, displaying, publishing, distributing or broadcasting, or
causing to be advertised, printed, displayed, published, distributed or broadcast in any
manner, any statement or representation with regard to the sale of goods or the extension
of consumer credit including the rates, terms or conditions for the sale of such goods or

-18-

the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive[.]

Id. at § 46A-6-102.

76.    The Defendants' actions of marketing, selling and administering the ancillary services at issue in this Complaint, including Payment Protection, fit within the definitions and scope of, and violate, the West Virginia Consumer Credit and Protection Act.

77.    The Attorney General of the State of West Virginia is specifically charged with administration of West Virginia Code §§ 46A-7-102 et seq., and may act sua sponte as the agent and legal representative of the State in civil proceedings to enforce the statute.  W. Va. Code § 46A-6-103, §§ 46A-7-102, -108, -110, 111.

78.    Violations of statutes enacted to protect the consuming public or in the exercise of the State's police power constitute unfair or deceptive acts or practices.

79.    Defendants' conduct described above constitutes multiple, separate violations of the West Virginia Consumer Credit and Protection Act.  Among other things, Defendants have engaged in deceptive practices by representing that ancillary services have characteristics and benefits that they do not have; representing that they are of a particular standard, quality, or grade when they are of another; advertising ancillary services like Payment Protection with the intent to not sell them as advertised; engaging in other conduct which similarly creates a likelihood of confusion or of misunderstanding; unlawfully making or collecting charges in excess of those permitted; and imposing or collecting excess charges.  By failing to disclose and omitting material facts, Defendants have further engaged in deceptive and fraudulent practices in violation of the Act.

80.     Each violation of the statute by the Defendants is an unfair and deceptive act or practice in the conduct of the trade or commerce in violation of West Virginia Code § 46A-6-104. For example, each time Defendants enrolled a West Virginia consumer in a Payment Protection Plan or similar ancillary service without his or her assent constitutes a separate violation of the Act.  Likewise, each enrollment by Defendants of a West Virginia consumer who is ineligible for the service's benefits (due to age, work status, disability or for any other reason) constitutes a separate violation of the Act.  Similarly, each time Defendants enrolled a West Virginia consumer in a Payment Protection Plan or similar ancillary service but failed to disclose all material restrictions, limitations, and exclusions constitutes a separate violation of the Act.

81.     The Defendants' violations are willful.  The Defendants are aware of the violations, including the widespread slamming practices engaged in and the enrolling of cardholders who are ineligible for benefits offered under Payment Protection, yet fail to adequately and affirmatively take steps to cure the violations or refund moneys owed.

82.     Defendants' willful violations justify assessing civil penalties of up to $5,000 for each violation of the Act as authorized under W. Va. Code §§ 46A-7-108, 109, 110 and 111(2).

## COUNT II
## UNCONSCIONABLE CONDUCT

83.     The State realleges all prior paragraphs of this Complaint as if set forth fully herein.

84.     Defendants' sales of Payment Protection Plans and other ancillary services constitute consumer credit sales. The transactions are therefore subject to W. Va. Code § 46A-7-109.

85.     Via its sales of Payment Protection Plans and other ancillary services, Defendants made and enforced unconscionable terms and provisions of consumer credit sales and engaged in unconscionable conduct in inducing consumers to enter into consumer credit sales.

86.     A factor to consider when determining if conduct is unconscionable is if the seller at the time of the sale knew of the inability of the buyer to receive substantial benefits from the property or services sold.  The Defendants knew or should have known of the inability of consumers to receive substantial benefits from the Payment Protection Plan and other ancillary services sold in violation of W. Va. Code § 46A-7-109(3)(b).

87.     The Attorney General is authorized to maintain an action for unconscionable conduct pursuant to W. Va. Code § 46A-7-109 and 111(2) and to seek civil penalties.

88.     Each and every time the Defendants sold a Plan to a consumer without verifying his or her eligibility to receive benefits under the Plan, Defendants engaged in a willful, repeated act whereby civil penalties are appropriate.  Furthermore, Defendants' Payment Protection Plans and other ancillary services are so confusing as to when coverage is triggered, so restricted in terms of the benefits they provide to consumers, and processing claims is made so difficult by Defendants, that these services do not provide a substantial benefit to consumers, and Defendants' sale of such services constitutes a willful, repeated act whereby civil penalties are appropriate.

## COUNT III
## COLLECTION OF EXCESS CHARGES

89.     The State re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

90.     By their violations of West Virginia law as set forth herein, the Defendants have collected excess charges under West Virginia Code § 46A-7-111(1).

## RELIEF

**WHEREFORE**, the State of West Virginia, by and through its Attorney General,

respectfully prays that this Court grant the following relief:

1.  Entering Judgment in favor of the State in a final order against each of the Defendants;

2.  Enjoining the Defendants and their employees, officers, directors, agents, successors, assignees, merged or acquired predecessors, parent or controlling entities, subsidiaries, and all other persons acting in concert or participation with them, from engaging in unfair or deceptive practices and unconscionable conduct in violation of West Virginia law and ordering temporary, preliminary or permanent injunction;

3.  Awarding judgment against the Defendants for restitution and disgorgement of monies under the general equitable powers of this Court, and any other authority, for all West Virginians injured by Defendants' acts described in this Complaint;

4.  Declaring that each act of each of the Defendants described in this Complaint constitutes a separate violation of West Virginia law;

5.  Providing for recovery of "excess charges" under West Virginia Code § 46A-7-111(1);

6.  Imposing civil penalties of up to $5,000 for each repeated and willful violation of Chapter 46A under West Virginia Code § 46A-7-111(2);

7.  Awarding equitable relief, including but not limited to restitution and disgorgement of monies obtained; and

8.  Granting the State:

    a.  The cost of investigation and reasonable attorneys' fees, as authorized by the West Virginia Consumer Credit and Protection Act,

    b.  Post-judgment interest, and,

    c.  All other relief as provided by law and/or as the Court deems appropriate and just.

Date:  August 5, 2011

Respectfully submitted,

*Frances a Hughes*

FRANCES A. HUGHES, ESQUIRE, WV Bar No: 1816
Chief Deputy of the Attorney General
Office of the Attorney General
State Capitol Complex
Buildling 1, Room E-26
Charleston, WV 25305
Phone: (304) 558-2021
Fax: (304) 558-0140

Guy Bucci, Esquire, WV Bar No: 0521
Timothy Bailey, Esquire, WV Bar No: 5839
Lee Javins, Esquire, WV Bar No: 6613
Special Assistant Attorney General
Bucci Bailey & Javins, LLC
213 Hale Street
Charleston, WV 25301
Toll Free: (800) 497-0234
Local: (304) 345-0346
Fax: (304) 345-0375 (Fax)

William Druckman, Esquire, WV Bar No: 1061
The Law Offices of Druckman & Estep
Special Assistant Attorney General
606 Virginia Street East, Suite 100
Charleston, WV 25301
Phone: (304) 342-0367
Fax: (304) 343-0099

Richard M. Golomb, Esquire, PA Bar No: 72845
Golomb & Honik, P.C.
Special Assistant Attorney General
1515 Market Street, Suite 1100
Philadelphia, PA 19102
(215) 985-9177 (Phone)
(215) 985-4169 (Fax)

Laura Baughman, Esquire, TX Bar No: 00791846
(pro hace vice admission pending)
Baron & Budd, P.C.
Special Assistant Attorney General
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Phone: (214) 521-3605
Fax: (214) 520-1181

-23-

**CERTIFIED MAIL**





UNITED STATES POSTAGE

$ 05.65

02 1R
0006581724    SEP 02 2011
MAILED FROM ZIP CODE 25311

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E
Charleston, WV 25305



9171 9237 9000 1000 5204 04



**Natalie E. Tennant**
Secretary of State
Telephone: 304-558-6000
Toll Free: 866-SOS-VOTE
www.wvsos.com

| | |
|---|---|
| ControlNumber: | 321270 |
| Defendant: | DISCOVER BANK |
| County: | 26 |
| | 9/1/2011 |
| Civil Action: | 11-C-86-N |

Bill Withers, Circuit Clerk
Mason County Courthouse
200 6th Street
Point Pleasant WV 25550-1131

I am enclosing:

| | | |
|---|---|---|
| _____ summons | _____ affidavit | _1_ summons and complaint |
| _____ notice | _____ answer | _____ summons and verified complaint |
| _____ order | _____ cross-claim | _____ summons and amended complaint |
| _____ petition | _____ counterclaim | _____ 3rd party summons and complaint |
| _____ motion | _____ request | _____ notice of materialmans lien |
| _____ suggestions | _____ notice to redeem | _____ notice of mechanic's lien |
| _____ interrogatories | _____ request for production | _____ notice of uim claim |
| _____ discovery | _____ request for admissions | _____ subpoena duces tecum |
| _____ suggestee execution | _____ re-issue of uim claim | _____ Other |
| _____ subpoena | _____ writ | |
| _____ stipulation | _____ writ of mandamus | |

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in your name and on your behalf.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in your name and on behalf as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office.***

*Sincerely,*

Natalie E. Tennant
Secretary of State